IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL S. STANKIEWICZ, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 08-2754 |
| | : | |
| CISCO SYSTEMS, INC., | : | |
| Defendant | : | |

M E M O R A N D U M

**STENGEL, J.**                                                                          September 30, 2009

Paul S. Stankiewicz filed this age-related employment discrimination case pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. The defendant has filed a motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and to compel arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4. The defendant indicates that the purpose of this motion is to determine whether a valid agreement to arbitrate exists between the parties and, if so, whether Mr. Stankiewicz's claims are within the scope of that agreement. For the following reasons, I will deny the motion in its entirety.

**I. BACKGROUND**

Paul S. Stankiewicz was born in 1947 and began his employment with Cisco in 1993, as an Accounts Manager, at the age of forty-six years. See Compl. ¶¶ 9, 10. It is important to note that when he began his career with the defendant, Mr. Stankiewicz was not presented an arbitration agreement as part of his initial employment package. In

1996, at forty-nine years, he was promoted to National Accounts Manager. Id. ¶ 11. A year later, he became Major Accounts Manager. Id. ¶ 12. Mr. Stankiewicz had enjoyed excellent performance ratings and had developed long term relationships with clients, such that he had built substantial and lucrative accounts. Id. ¶¶ 13, 14. Around 2002, the defendant began chipping away at Mr. Stankiewicz's accounts and re-assigning them to younger employees with less experience. Id. ¶¶ 18, 74, 75. When he complained to his manager, the manager responded, "Deal with it." Id. ¶¶ 20. 21. These reassignments led to his decreased production and subsequent inability to meet a 500% increased quota imposed upon him by the defendant. Id. ¶¶ 22, 23, 24.

Shortly thereafter, the manager told Mr. Stankiewicz that because of his declining sales figures, Mr. Stankiewicz was becoming ineffective and should seek another position within the company. Id. ¶ 27. His manager issued "letters of concern" about Mr. Stankiewicz's performance. Id. ¶ 45. Finally, the defendant decided that one of the plaintiff's biggest accounts would be better handled in Texas where two junior managers worked. Id. ¶¶ 67. These junior managers had amassed drastically lower sales for that account than did Mr. Stankiewicz, and were considered the worst performers on the team. Id. ¶¶ 59, 62. The defendant told Mr. Stankiewicz that he would be terminated within two months because of this restructuring, and assured him that it was not because of his performance. Id. ¶¶ 67, 76. Mr. Stankiewicz requested to be transferred to Texas in order to remain employed but was told by the defendant that that was "not an option" for him.

Id. ¶¶ 68, 69.  When he tried to get other jobs in the company, Mr. Stankiewicz was told that he would not be able to "move fast enough" for those positions.  Id. ¶¶ 28, 29, 30.  Finally, on October 20, 2006, Mr. Stankiewicz was terminated, a month shy of his fifty-ninth birthday.  Id. ¶ 77.

## II.  DISCUSSION

The Federal Arbitration Act provides that agreements to resolve disputes by arbitration "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; see Harris v. Green Tree Financial Corp., 183 F.3d 173, 178 (3d Cir. 1999) (the Federal Arbitration Act "makes arbitration agreements enforceable to the same extent as other contracts").  The Supreme Court has acknowledged that the arbitrability of a particular dispute is to be determined with a "healthy regard for the federal policy favoring arbitration."  Moses H. Cone Mem'l Hosp. v. Mercury Constr., 460 U.S. 1, 24-25 (1983).  Accordingly, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Id.  However, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, a court should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.  Par-Knit Mills, Inc. V. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980).

Arbitration is a creature of contract law.  E.I. DuPont de Nemours & Co. v. Rhone

Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 195 (3d Cir. 2001).  As such, "it is a way to resolve those disputes, but only those disputes, that the parties have agreed to submit to arbitration, First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995), and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986).  Accordingly, whether a party is bound to arbitrate is a matter to be determined by the court on the basis of the contract entered into by the parties.  Id. at 649 (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547 (1964)).

   Where the validity of an arbitration agreement is disputed, a court evaluates the agreement under state contract law.  Spinetti v. Service Corp. Int'l, 324 F.3d 212, 214, 219 (3d Cir. 2003); Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002).  As the parties recognize, Pennsylvania contract law applies in this case.  It is well settled in Pennsylvania that where a party to a civil action seeks to compel arbitration, a court must employ a two-part test to determine if arbitration is required.  Keystone Technology Group, Inc. v. Kerr Group, Inc., 824 A.2d 1223, 1227 (Pa.Super. 2003).  First, it must be determined whether a valid agreement to arbitrate exists.  Id.  Second, if such an agreement does exist, it must be determined if the dispute involved is within the scope of the arbitration provision.  Id.  The scope of the arbitration is determined by the intention of the parties as ascertained in accordance with the rules governing contracts generally.

4

Id.  There must be a meeting of the minds in order for there to be a valid contract to arbitrate.  Quiles v. Financial Exchange Co., 879 A.2d 281, 285 (Pa.Super. 2005).

Under Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration.  Kirleis v. Dickie, McCamey & Chilote, P.C., 560 F.3d 156, 160 (3d Cir. 2009).  As in the formation of any contract, "there must be an intended, definite, specific offer before any offer can be accepted or any enforceable contract created."  Morosetti v. La. Land & Exploration Co., 564 A.2d 151, 152 (Pa. 1989).  Further, "the acceptance of the offer must be absolute and identical with the terms of the offer."  Quiles, 879 A.2d at 285 (quoting Hedden v. Lupinsky, 176 A.2d 406, 408 (Pa. 1962)); see also Kirleis v. Dickie, McCamey & Chicolte, PC, 2007 U.S. Dist. LEXIS 53542, at *20 (W.D. Pa. July 24, 2007) (an argument that plaintiff must have known or should have asked falls short of the standard required by Pennsylvania law that plaintiff actually agree to arbitrate her claims).

In the employment context, arbitration agreements will be upheld when they are "specific enough (i.e., unambiguous) to cover the employee's claims" and "the employee has *expressly agreed* to abide by the terms of [the] agreement.  Id. at 160-161 (emphasis in original) (quoting Quiles, 879 A.2d at 285).  The Pennsylvania Supreme Court has held that an agreement to arbitrate must be "clear and unmistakable" and cannot arise "by implication."  Id. at 161 (quoting Emmaus Mun. Auth. v. Eltz, 204 A.2d 926, 927 (Pa.

1964)). Thus, before a party to a lawsuit can be ordered to arbitrate, there should be an *express, unequivocal* agreement to that effect. Id. (emphasis in original) (citing Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980)).

In determining whether a valid agreement to arbitrate between Mr. Stankiewicz and the defendant exists, a review of the record as it currently stands is necessary. As part of Cisco's employee benefits package, Mr. Stankiewicz participated in Cisco's annual Sales Incentive Compensation Plans, by which he could earn additional compensation by satisfying certain performance goals. In order to receive benefits under these plans and to continue his employment, Mr. Stankiewicz had to agree each year to that year's Compensation Plan Terms and Conditions document, Compensation Plan Elements document, and his individualized sales goals. Mr. Stankiewicz would indicate his agreement to abide by the terms of these documents by an electronic signature attached to his annual Goal Sheet. See Def. Exh.'s E through I. His managers also agreed annually to Mr. Stankiewicz's participation. Among the terms and conditions set forth in the most recent of these documents was an arbitration clause requiring both parties to arbitrate any and all existing and future claims arising out of Mr. Stankiewicz's employment with Cisco. Specifically, the clause read:

> Plan Participants and Cisco acknowledge and agree that any
> and all disputes or claims arising from or relating to a Plan
> Participant's recruitment to or employment with Cisco
> (including but not limited to disputes or claims arising from or
> relating [to] the Cisco Incentive Compensation Plan), or the
> termination of the Plan Participant's employment, will be

6

> resolved solely and exclusively pursuant to final and binding
> arbitration in lieu of any evidentiary hearing before a
> government agency and/or a court trial before a judge or jury,
> pursuant to the terms of Cisco's Arbitration Agreement and
> Policy . . . . The parties' agreement to arbitrate means that
> both Cisco and the Plan Participant have expressly waived
> any and all rights to a trial before a court or a jury.

See Def. Exh. B, Exh. C, and Exh. D.  Thus, the defendant alleges that when Mr. Stankiewicz agreed to participate in his employer's compensation plan, he *expressly* agreed to arbitrate any claims related to his employment in accordance with the terms of Cisco's Arbitration Agreement and Policy which provided as follows:

> [Employee and Cisco] agree to arbitrate before a neutral
> arbitrator any and all disputes or claims arising from or
> relating to Employee's recruitment to or employment with
> Cisco, or the termination of that employment, including
> claims against any current or former agent or employee of
> Cisco, whether the disputes or claims arise in tort, contract, or
> pursuant to a statute, regulation, or ordinance now in
> existence or which may in the future be enacted or recognized
> . . . .

See Def. Exh. J.  The Arbitration Agreement further provides that "arbitration of the disputes and claims covered by this Agreement shall be the sole and exclusive method of resolving any and all existing and future disputes or claims arising out of the employee's recruitment to or employment with Cisco or the termination thereof."  Id.  The defendant asserts that the institution of the action in this court directly violated Mr. Stankiewicz's agreement to arbitrate such claims.

      Shortly after Mr. Stankiewicz complained to his manager that he was being treated

unfairly when compared to younger employees, he received an email with an Arbitration Agreement, stating that the defendant did not have a signed Arbitration Agreement on file for him.  Mr. Stankiewicz was "requested" to return the agreement with an electronic signature.  See Stankiewicz Dec. ¶ 5.  Mr. Stankiewicz responded that he did not feel he should be required to sign the agreement after more than ten years of employment.  His manager responded that if he really felt strongly against signing the form, he would address it with Human Resources to determine the alternatives.  Id. ¶ 6.  Mr. Stankiewicz asked other long-standing employees whether they were required to sign an arbitration agreement, and they responded in the negative.  Id. ¶ 7.  Mr. Stankiewicz next received an email from Human Resources entitled "FINAL REMINDER" but advising him that even though he had not accepted the agreement, he was deemed to have accepted it and was bound by the agreement "regardless of whether or not you sign it."  Id. ¶ 8.  The defendant thereafter incorporated, for the first time, the Arbitration Agreement into its Incentive Compensation Plan.  Id. ¶ 9.

In 2005, Mr. Stankiewicz believed that his assigned annual goal was unreasonably high, and attempted to negotiate it with his manager.  The manager responded that the incentive bonus plan was offered on a "take it or leave it" basis, and that there would be no negotiation.  Id. ¶ 11.  Throughout his ten year career with the defendant, Mr. Stankiewicz was able to make five times his relatively low base salary through the incentive compensation commissions.  Id. ¶ 12.  The manager notified him that a rejection

of the incentive plan would result in his receiving only his base salary or in his termination.  Id. ¶ 13.  With no other alternative, Mr. Stankiewicz accepted the plan exactly as it was presented.  Id. ¶ 14.

Mr. Stankiewicz noted that the documents associated with the Incentive Compensation Plan did not indicate that an employee had any option but to accept the plan as presented, or that an employee needed to seek the advice of an attorney prior to signing.  Id. ¶ 16.  However, the Agreement to Arbitrate, incorporated by reference, states that the employee has been advised to consult with an attorney before signing the agreement.  Id.

There is no question that Mr. Stankiewicz did not expressly agree to this arbitration agreement.  In fact, he vigorously opposed it.  He attempted to negotiate with the defendant.  Instead, he was informed by the defendant that he was bound by the agreement whether he signed it or not.  The defendant then incorporated the agreement into the incentive compensation plan, which he accepted after he was told negotiation was not an option.

To suggest that Mr. Stankiewicz "voluntarily" accepted the Incentive Compensation Plan and thus "voluntarily" accepted the incorporated Arbitration Agreement is nonsense.  There was no mutual manifestation of an intention to be bound, no absolute acceptance of an offer, no express, unequivocal agreement to abide by the terms of the agreement, and no meeting of the minds.

9

Because it is clear that no valid agreement to arbitrate exists, I will deny the defendant's motion to compel arbitration in its entirety.

An appropriate Order follows.

11